# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**TAMESHA R. IRVING,**

    **Plaintiff,**

    v.                                                        Case No. 17-CV-1251

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

    **Defendant.**

## DECISION AND ORDER

Tamesha R. Irving seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). For the reasons stated below, the Commissioner's decision is reversed and the case is remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

Irving filed an application for supplemental security income alleging disability beginning on January 1, 2003 due to a pinched nerve, back problems, carpal tunnel syndrome, depression, torn ligaments in both knees, swelling of the feet and hands, and migraines. (Tr. 17, 225.) Although Irving alleges disability beginning on January 1, 2003, because Irving filed an application for supplemental security income, the earliest month for which she can receive benefits is the month following the month she filed her application. 20 C.F.R. § 416.335. Irving filed her application on November 30, 2012. (Tr. 17.) A hearing was held before an Administrative Law Judge on October 28, 2015. (Tr.

59.) Irving, represented by counsel, appeared and testified at the hearing, as did Robert Verkins, a vocational expert.

In a written decision issued December 16, 2015, the ALJ found Irving had the severe impairments of obesity, bilateral carpal tunnel syndrome, degenerative disc disease, bilateral degenerative joint disease of the knees status post left knee replacement, anterior cruciate ligament tear in the right knee, fibromyalgia, depression, and anxiety. (Tr. 19.) The ALJ further found that Irving did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 20.) The ALJ found Irving had the residual functional capacity ("RFC") to perform light work, with the following limitations: requires the use of a handheld assistive device on uneven terrain and for prolonged ambulation; can use the contralateral upper extremity for lifting and carrying consistent with light exertional work; can frequently balance, stoop, crouch, and climb ramps and stairs; can occasionally climb ladders, ropes, or scaffolds; can frequently handle, finger, and feel bilaterally; can tolerate frequent exposure to hazards such as moving machinery and unprotected heights; can perform jobs that do not require any complex written or verbal communication; and can perform simple, routine, and repetitive tasks requiring only occasional interaction with the public and with coworkers. (Tr. 21-22.)

Although Irving had no past relevant work, the ALJ found that based on Irving's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Irving could perform. (Tr. 30.) Thus, the ALJ found Irving was not disabled since November 30, 2012 (the date the application was filed). (Tr. 31.) The ALJ's decision became

the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review. (Tr. 4-5.)

## DISCUSSION

### *1. Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### *2. Application to this Case*

Irving alleges multiple errors in the ALJ's decision. She argues the ALJ erred in failing to properly evaluate her testimony and in failing to properly assess her subjective complaints. Irving also argues the ALJ erred in crafting her RFC by failing to include manipulative limitations that account for the full range of her arm and wrist conditions, failing to account for all of the limitations from her mental impairments, and failing to sufficiently allow for an assistive device. Finally, Irving argues the ALJ failed to properly evaluate her fibromyalgia and its impact on her workplace functioning.

I will address each argument in turn.

### 2.1 Consideration of Irving's Testimony and Subjective Complaints

Irving argues the ALJ failed to discuss any of her testimony in which she offered greater descriptions of her pain and functional limitations, including limitations in the use of her fingers and hands and ongoing difficulties with her knees. Irving further argues the ALJ failed to properly consider her subjective complaints.

As an initial matter, the parties dispute whether SSR 96-7p or SSR 16-3p applies to the ALJ's evaluation of Irving's subjective complaints. On March 28, 2016, SSR 16-3p became effective and issued new guidance regarding the evaluation of a disability claimant's statements about the intensity, persistence, and limiting effects of symptoms. *See* SSR 16-3p, 2016 WL 1237954 (Mar. 28, 2016). Under SSR 16-3p, an ALJ now assesses a claimant's subjective symptoms rather than assessing her "credibility." Irving contends that the ALJ's failed to properly evaluate her subjective complaints in light of SSR 16-3p. The Commissioner contends that SSR 16-3p is not retroactive and that the ALJ's analysis was proper under the ruling that was controlling at the time the decision was

issued. Courts in this circuit have divided on whether SSR 16-3p is retroactive. *See Fernandez v. Berryhill*, No. 2:16-CV-358-PRC, 2017 WL 4325304, at *5 (N.D. Ind. Sept. 29, 2017) ("However, SSR 16-3p is not retroactive; therefore, the 'credibility determination' in the ALJ's decision is governed by the standard of SSR 96-7p."); *Shank v. Barryhill*, No. 116CV01856JMSMJD, 2017 WL 2951556, at *3 n.3 (S.D. Ind. June 6, 2017), *report and recommendation adopted*, No. 116CV01856JMSMJD, 2017 WL 2926013 (S.D. Ind. July 7, 2017) (finding that SSR 16-3p is not retroactive); *Mendenhall v. Colvin*, No. 3:14-CV-3389, 2016 WL 4250214, at *3 (C.D. Ill. Aug. 10, 2016) (SSR 16-3p applies retroactively); *Lasher v. Berryhill*, No. 16-CV-267-WMC, 2018 WL 3425289, at *5 and n.6 (W.D. Wis. July 16, 2018) (while noting that courts "have gone both ways on the retroactive application of SSR 16-3p," found SSR 16-3p applied retroactively based on the Seventh Circuit's statement in *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) that the "change in wording is meant to clarify").

Because, as further discussed below, this case must be remanded, and because the new ruling will apply on remand, I need not determine whether SSR 16-3p applies retroactively. On remand, the ALJ must determine Irving's subjective symptoms in accordance with the new ruling. However, to give the ALJ some guidance on remand, I will address several errors in the ALJ's assessment of Irving's subjective complaints.

Whether under SSR 96-7p or SSR 16-3p, an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence. Rather, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily

activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. SSR 96-7p; SSR 16-3p. In her decision, the ALJ focuses almost exclusively on the objective evidence to discredit Irving's subjective complaints. The ALJ highlights this focus by underlining the results of several objective tests. (Tr. 23-25.) For example, the ALJ notes that an "electromyogram and nerve conduction study . . . showed <u>mild</u> bilateral carpal tunnel syndrome," Irving had "<u>5/5 strength</u> and <u>normal sensation</u> in all the extremities"; Irving had "<u>mild</u> arthritic changes in the left knee"; and Irving had "<u>mild</u> disc disease at L3-L4 and L4-L5." (Tr. 23) (emphasis in original).

Further, relying on the objective testing, the ALJ found that Irving's symptoms improved with treatment and her examiners noted relatively mild clinical abnormalities on most examinations. (Tr. 28.) But the record shows that Irving's physical impairments did not improve with treatment. For example, Irving underwent carpal tunnel surgery on her right wrist on April 4, 2013. (Tr. 478.) While her symptoms were "remarkably improved" eleven days post surgery (Tr. 469) and she demonstrated a negative provocative test for carpal tunnel in late April 2013 (Tr. 472), by August 2013, Irving was again experiencing pain, swelling, and numbness in both wrists, with her right worse than her left (Tr. 475). Irving had considered carpal tunnel surgery on her left wrist, but told her treating doctor that she did "not really want to go ahead with any type of surgery on the left wrist since she did not feel that she gained much benefit from surgery on the right side." (Tr. 475.) Irving's bilateral wrist

pain continued (Tr. 597) and her treating physician did not recommend surgery on the left wrist since Irving "derived no benefit from surgery on the right side" (Tr. 476).

Similarly, Irving underwent a total knee replacement of her left knee in February 2014. (Tr. 503.) In March 2014, her treating physician noted that Irving was doing well overall (Tr. 611) and her visiting nurses stated that she was feeling really good and had good progress (Tr. 551). In July 2014, her treating physician noted that Irving had good range of motion and was doing "fairly well," despite the fact Irving stated that she felt "like something [was] tearing in her knee" and stated that she continued to have pain and the pain was worse than it was before the surgery. (Tr. 625.) In November 2014, her treating physician noted that Irving was fitted with an orthosis wrap, was given medication, and attended physical therapy, with little relief. (Tr. 636.) He opined that because there was no evidence that her knee prosthesis was loosening or misaligned, and because she attempted "conservative therapy and physical therapy" for her pain, it was "reasonable to order CT to evaluate for any underlying soft tissue abnormalities." (*Id.*)

Thus, while the objective medical tests indicated improvement, what is clear from both Irving's testimony and the medical records is that Irving continued to experience significant pain. Beyond the objective medical evidence, the ALJ discounts Irving's subjective complaints based solely on her "poor and inconsistent work history" prior to her application date and her ability to engage in activities of daily living, such as caring for her seven children, preparing meals, and performing basic housework. (Tr. 29.) This is problematic because it is unclear from the record why Irving had a "poor and inconsistent work history" in the past, and the ALJ does not explore the reasons. Further, the ALJ does not consider Irving's testimony that her older children (the oldest of which

is 23) helped her care for her younger children (Tr. 82) and her older children assisted her in the household tasks (Tr. 64, 83).

Regarding Irving's mental impairments, the ALJ discounts Irving's subjective complaints because of her "conservative mental health treatment." (Tr. 28.) This description is unclear. Irving does not allege she experienced episodes of decompensation requiring hospitalization. She suffers from anxiety and depression and treated those conditions with regular therapy sessions and medication. The ALJ does not articulate why this treatment is considered "conservative" in Irving's case. Further, the ALJ faults Irving for her lack of compliance with treatment, without considering her explanations for missing appointments, namely a death in the family and lack of transportation. (Tr. 88, 792.) On remand, if the ALJ finds Irving's subjective complaints are not substantiated by the objective evidence, she must take care to evaluate Irving's subjective complaints using the factors articulated in SSR 16-3p. The ALJ should consider Irving's testimony, as well as any other relevant evidence.

### 2.2 Formulation of Irving's RFC

Irving argues the ALJ made multiple errors in crafting her RFC. Specifically, Irving argues the ALJ failed to account for the full range of Irving's arm and wrist conditions, failed to account for limitations due to her mental impairments, and failed to properly allow for an assistive device. RFC is the most the claimant can do in a work setting "despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); *see also* 20 C.F.R. § 404.1545(a)(1); SSR 96–8p. The Administration must consider all of the claimant's known, medically determinable impairments when assessing RFC. 20 C.F.R. § 404.1545(a)(2), (e). This includes all physical and mental medically determinable impairments, even those that are not considered severe. *Craft v. Astrue*, 539 F.3d 668,

676 (7th Cir. 2008); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling.").

The ALJ considered Irving's carpal tunnel syndrome; however, found that she could still frequently handle, finger, and feel bilaterally because of her retained strength and sensation in the upper extremities. (Tr. 24.) Irving argues the ALJ erred in focusing solely on her carpal tunnel syndrome, when her medical records show that she had other arm and wrist conditions, such as a ligament tear and degenerative changes. (Tr. 655-58.) The ALJ's error, however, does not stem from her failure to properly consider the etiology of Irving's wrist and hand problems. After all, while Irving argues that "proper consideration of this evidence *could have led* to greater limitations in the amount of handling, fingering, and feeling Irving could perform" (Pl.'s Reply Br. at 3, Docket # 19) (emphasis added), she does not point to any specific evidence showing greater limitations due to these additional ailments.

Rather, the ALJ's error, as above, comes from her improper consideration of Irving's subjective complaints. Again, while the objective medical evidence showed retained strength and sensation in the upper extremities, Irving testified that she cannot hold items such as coins or paper because of the tingling in her hands. (Tr. 78.) Irving testified that she has issues dropping things and testified that when she picks things up, it feels like her "wrists are breaking." (Tr. 78-79.) Irving consistently reported to her treating physician, Dr. Rizwanullah Arain, that she experienced numbness and tingling in her hands and felt as if her wrists were "going to break." (Tr. 351, 378, 382,

715, 717, 719, 721, 723, 725, 727, 729, 731, 733, 735, 737, 740, 749.) Again, on remand, the ALJ must properly consider Irving's subjective complaints.

Irving further argues the ALJ's limitation to jobs that do not require any complex written or verbal communication and to simple, routine, and repetitive tasks requiring only occasional interaction with the public and with coworkers, fails to properly account for her moderate limitations in concentration, persistence, or pace and social functioning.

The Seventh Circuit has stated that the ALJ must incorporate a claimant's limitations into the hypothetical questions posed to the VE at step five. *See O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (finding that the ALJ erred when his hypothetical question to the VE failed to take into account his finding at step two that the claimant had deficiencies in social functioning and concentration, persistence, and pace). Stated more broadly, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003).

The ALJ found that Irving had moderate difficulties in maintaining concentration, persistence, or pace and limited her to jobs that do not require any complex written or verbal communication and to simple, routine, and repetitive tasks requiring only occasional interaction with the public and with coworkers. Irving generally argues that a limitation to simple, routine, and repetitive tasks does not properly account for moderate difficulties in maintaining concentration, persistence, or pace. Irving further argues the ALJ failed to incorporate the limitations identified by State Agency psychologists Drs. Rattan and Pape, despite according the opinions great weight and failed to consider the limitations identified by her treating psychiatrist, Dr. Kauth, to whom the ALJ accorded partial weight.

In *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015), and *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014), the Seventh Circuit addresses the issue of how ALJs should be incorporating limitations in concentration, persistence, or pace into their RFC determinations. A detailed assessment of a claimant's mental RFC is typically provided by a state consulting psychologist on a form called a Mental Residual Functional Capacity Assessment ("MRFCA") if the state consultant concludes from the Psychiatric Review Technique ("PRT") form that the claimant's mental assessment is severe but does not meet or medically equal a listing. This procedure is explained in the SSA's Program Operations Manual System, "a primary source of information used by Social Security employees to process claims for Social Security benefits," at DI 24505.025 and DI 24510.060–65, at https://secure.ssa.gov/apps10/poms.nsf/partlist.

In *Varga*, the ALJ found at step three that the claimant had moderate limitations in concentration, persistence, or pace, but then failed to provide the more detailed assessment of the claimant's RFC at steps four and five. Specifically, a state agency psychological consultant completed the PRT form and the MRFCA form. 794 F.3d at 811. Section I of the MRFCA form, entitled "Summary Conclusions," contains boxes the examiner can check evaluating the claimant in four different areas: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Section III of the MRFCA form is entitled "Functional Capacity Assessment" and instructs the examiner to explain his or her summary conclusions in a narrative form. In *Varga*, while the state agency consultant had completed Section I of the MRFCA form, he failed to include the narrative statement of the claimant's mental RFC in Section III of the form. *Id.* *Varga* held that "where, as here, no narrative translation exists—because of error on the part of the doctor or the agency—an ALJ's hypothetical question to the VE must take into account any

moderate difficulties in mental functioning found in Section I of the MRFCA form, including those related to concentration, persistence, or pace." *Id.* at 816.

In *Yurt*, the court held that the ALJ erred in relying upon the consulting psychologist's conclusion that the claimant retained the capacity for unskilled work even though the consultant had checked boxes on the MRFCA form indicating that claimant was moderately limited in six work related functions. 758 F.3d at 857-58. In distinguishing *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002), a case where the court allowed a hypothetical to stand where the consultative physician translated his findings into a specific RFC assessment, the *Yurt* court found that the Section III narrative failed to adequately cover all of the limitations the consultant listed in Section I. 758 F.3d at 858-59.

While the State Agency psychologists in this case utilized an electronic version of the agency's MRFCA form, the application of *Yurt* and *Varga* does not change. As the court noted in *Pingel v. Colvin*, 156 F. Supp. 3d 947, 958 (E.D. Wis. 2016),

> *Yurt* apparently requires the ALJ to compare the checked boxes in Section I of the MRFCA form to the consultant's narrative summary of the claimant's mental RFC in Section III and then add limitations for those functions for which the "moderately limited" box is checked if they are not otherwise accounted for in the consultant's narrative conclusion. In other words, the ALJ may not assume that the consultant has followed the Agency's instructions in completing the MRFCA form and incorporated into his Section III narrative a "detailed explanation of the degree of limitation for each category [of work related function]."

Irving argues that Dr. Pape opined that Irving had moderate limitations in her ability to maintain attention and concentration for extended periods and both State Agency psychologists found Irving had moderate difficulties with the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 111, 128.) Further, Irving argues

Dr. Pape opined that she had moderate limitations in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 128.) Irving argues that despite according both psychologists great weight, she failed to account for these limitations, for example, by taking into account time off-task or limiting the work pace. Irving also argues the State Agency psychologists identified greater restrictions in social functioning. For example, Irving argues Dr. Rattan opined Irving was moderately limited in the ability to respond appropriately to changes in the work setting, but failed to include a limitation on workplace change in the RFC.

Again, *Yurt* requires the ALJ to add limitations for those functions of which the claimant is moderately limited if the limitation is not otherwise accounted for in the consultant's narrative conclusion. While, for example, it is true that Dr. Pape found Irving moderately limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods, she explained that Irving's "preference to isolate in her room as opposed to spending time with others may impose moderate limitations in her ability to work near others and maintain appropriate work pace and attendance." (Tr. 128.) Thus, it appears the ALJ accounted for this limitation by limiting her interactions with the public and co-workers. Also, while Irving faults the ALJ for not including her moderate limitations in the ability to work in coordination with or in proximity to others without being distracted by them (*id.*), again, based on Dr. Pape's narrative, it appears the ALJ accounted for this in limiting Irving's interactions with others. However, because this case is being remanded on other grounds, the ALJ should take care in accounting for all of Irving's limitations in the RFC, as required by *Yurt* and *Varga*.

Irving also argues the ALJ failed to properly weigh the opinion of her treating psychiatrist, Dr. Kauth, and failed to account for his limitation that Irving could only work four to five hours per day. (Pl.'s Br. at 19, Docket # 15.) But the ALJ clearly rejected this portion of Dr. Kauth's opinion, by stating that "his opinions regarding the claimant's absenteeism are not consistent with the clinical observations noted by examiners or with the claimant's conservative course of mental health treatment." (Tr. 30.) While Irving argues the ALJ's mention of absenteeism referred only to missing two days of work per month (Docket # 19 at 6), I do not read the ALJ's decision as such.

Finally, Irving argues the ALJ failed to properly account for her need for an assistive device. The ALJ included a limitation in the RFC for the use of a handheld assistive device on uneven terrain and for prolonged ambulation. (Tr. 21.) The ALJ based this limitation on the medical records showing an antalgic gait. (Tr. 25.) Irving argues this limitation is insufficient because the records show she needs a walker (i.e., a two-handed device), and thus there is no "contralateral upper extremity" available for lifting and carrying. Irving further argues the use of a walker is inconsistent with the ALJ's limitations to occasional climbing of ladders, ropes, or scaffolds and frequent exposure to unprotected heights.

The Commissioner argues in June 2014, Irving's physical therapist noted that she met her goal of ambulating on even and uneven terrain with a normal gait pattern and without an assistive device. (Tr. 699.) While this is true, it ignores the multitude of subsequent records from Dr. Arain indicating Irving was ambulating with the assistance of a walker. (719, 721, 723, 725, 727, 729, 731, 733, 736, 738, 740, 742, 744, 746.) The Commissioner further argues the ALJ's question to the VE specifically incorporated "jobs that can be performed while using a hand-held device" and included the limitation of occasional climbing of ladders, ropes, or scaffolding, and the VE testified as to jobs

meeting these restrictions. (Tr. 96-97.) Although the VE clearly testified that jobs exist meeting all of these limitations, I agree with Irving that it seems counter-intuitive that a job that can be performed while using a hand-held device can also allow for the occasional climbing of ladders, ropes, or scaffolds. Again, as this case is being remanded on other grounds, perhaps the ALJ can explore this issue more thoroughly on remand.

### 2.3 Consideration of Fibromyalgia

Irving argues the ALJ failed to properly evaluate her fibromyalgia and its impact on her workplace functioning. She argues that her fibromyalgia symptoms included not only pain, but bowel problems and fatigue, that the ALJ failed to account for. (Docket # 15 at 29.) As with Irving's arm and hand limitations, the ALJ's error is not with her failure to include other symptoms of fibromyalgia. The record Irving cites, for example, does not indicate her fibromyalgia was causing fatigue or bowel problems. (Tr. 706.) Again, the issue is that Irving continued to experience significant pain. Because she was not responding to treatment such as physical therapy, occupational therapy, and epidural steroid injections, her treating physician, Dr. Kaplan, began to suspect fibromyalgia. (Tr. 460.) Another treating physician, Dr. Bobot, noted that Irving's pain was worsening over time, was constantly present, and was aggravated by any kind of activity or movement. (Tr. 708.) Dr. Bobot stated that the diffuse allodynia to even light touch was consistent with fibromyalgia. (Tr. 709.) Thus, the ALJ's error is again in her failure to properly consider Irving's subjective complaints of pain. The record clearly reflects Irving suffers from fibromyalgia, and the ALJ acknowledges this, but fails to probably evaluate her allegations of disabling pain. For these reasons, the ALJ must properly consider Irving's allegations of pain, whether from fibromyalgia or from other impairments.

## CONCLUSION

Irving alleges that the ALJ erred in failing to properly evaluate her testimony and assess her subjective complaints, in crafting her RFC, and in evaluating her fibromyalgia. I agree the ALJ erred and must re-examine these issues on remand.

Although Irving requests that this Court award her benefits in lieu of remanding the case, an award of benefits is appropriate only "if all factual issues have been resolved and the record supports a finding of disability." *Briscoe ex rel Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005). Here, there are unresolved issues and this is not a case where the "record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). Therefore, the case is appropriate for remand pursuant to 42 U.S.C. § 405(g), sentence four.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 24th day of September, 2018.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge